# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| **MIKYLA BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 6:14-cv-03529-MDH |
| | ) |
| **LESTER E. COX MEDICAL CENTERS** | ) |
| **d/b/a COXHEALTH,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 59). Upon careful review of the issues presented and legal arguments provided by the parties, the Court hereby **DENIES** Defendant's motion.[1]

## I. BACKGROUND

Plaintiff Mikyla Brown brings this lawsuit alleging her former employer, Lester E. Cox Medical Centers d/b/a CoxHealth, terminated her employment in violation of the Family and Medical Leave Act ("FMLA"). According to Plaintiff, "Defendant's failure and refusal to allow plaintiff medical leave under the FMLA, and/or defendant's failure to continue employment of plaintiff following absences from work due to her illness and/or her son's illness, was done in violation of the FMLA and/or retaliation[.]" Plaintiff seeks lost wages and benefits, interest for lost wages and benefits, attorney fees, expert fees, and costs.

Following the close of discovery, Defendant now moves for summary judgment. Defendant argues summary judgment is proper in this case because the undisputed material facts show Plaintiff failed to provide adequate notice to Defendant, prior to her termination for

---

[1] Although Defendant requested oral argument on its motion, the Court finds oral argument would be neither necessary nor beneficial to help the Court understand the facts and legal arguments presented.

violating the attendance policy, that her absences were for FMLA-protected reasons. Defendant argues Plaintiff should not be permitted "to blindside CoxHealth and raise the issue of FMLA protection for the first time after being notified of her termination" and "to elevate ordinary, unexcused absences with no reasonable notice whatsoever" into an FMLA claim. Plaintiff argues Defendant is not entitled to summary judgment because genuine issues of material fact exist as to whether Defendant was put on notice of Plaintiff's potentially FMLA-protected absences and whether Plaintiff's son's condition was FMLA- protected.

## II. STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). In other words, "[w]here there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. DISCUSSION

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there are genuine issues of material fact that preclude summary judgment.

2

## A. Undisputed Material Facts

CoxHealth ("Defendant") hired Mikyla Brown ("Plaintiff") as a Patient Care Assistant in 2012. Prior to starting at CoxHealth, Plaintiff attended orientation and training with Defendant during which she was advised of Defendant's policies and procedures, including Defendant's policies regarding discipline, absences, and tardiness. Defendant's attendance policy was a progressive discipline policy under which an employee could incur four absences in a twelve month rolling period without discipline, the employee was subject to progressive discipline starting at the fifth absence, and the employee was subject to discharge upon the eighth absence. Defendant's FMLA policy provided "unpaid, job-protected Family and Medical Leave of Absence as a benefit to the eligible employees to meet their needs." The FMLA policy stated that an employee taking unforeseeable leave "should provide the Human Resources Department with notice as soon as practicable" and "should also comply with any call-in procedures used in the employee's department."[2]

---

[2] Cheryl Dunn, Human Resources for CoxHealth, testified as follows regarding the relationship between the attendance policy and the FMLA policy:

> Q: Okay. And has there ever been a situation that you're aware of where you've looked back and said this person meets the number of absences, but some of these may be protected, so they should apply for FMLA at this point?
> A: Not to apply, but if we're reviewing -- for instance, we're at that stage, we might say, you know, would that have perhaps met the criteria? Let's take it out of the count. We just disregard that period.
> . . .
> Q: At the time Ms. Brown was employed, was there any date by which he or she, someone using FMLA, would have to submit their request for FMLA after an absence, an unplanned absence?
> A: Do you mean to qualify for FML?
> Q: Right.
> A: Yes -- well, they could always ask, you know, to apply. There may be some of those absences that wouldn't be designated as FML because of the time frame, but, again, if we're talking about termination, we're not going to terminate someone using absences, whether or not they're designated if -- because of timing. So, for instance, if a manager comes to me and says, well, I've got 10 absences, and I'm ready to move on to termination, and as we're looking we say 10 months ago one of those absences might have qualified, we're not going to designate that as FML at that time because it's too late, but we're going to take it out of consideration for termination.
> . . .
> Q: So you would disregard those dates, regardless of whether or not you had received an FMLA request at that point?
> A: Yes.

3

Case 6:14-cv-03529-MDH   Document 68   Filed 01/22/16   Page 3 of 12

In September of 2012, Plaintiff provided Annie Durrington, Assistant Nurse Manager, with an ER note explaining that she had been having migraines, had a spinal tap and blood patch, and was directed not to work for a couple of days. Ms. Durrington accepted the notice and stated that Plaintiff could just call in rather than bringing the note to her office. In September of 2012, Defendant advised Plaintiff in writing that she was not eligible for FMLA leave due to lack of hours worked. Plaintiff denies receiving a letter from Defendant.

In August of 2013, Plaintiff received a Corrective Action Memo for her fifth absence in a rolling twelve month period. Plaintiff understood at that time that eight absences in a rolling twelve month period would result in her discharge from CoxHealth. In September of 2013, Plaintiff received a Corrective Action Memo for her sixth absence in a rolling twelve month period. Plaintiff understood at that time that eight absences in a rolling twelve month period would result in her discharge from CoxHealth. In October of 2013, Plaintiff received a Corrective Action Memo for her seventh absence in a rolling twelve month period. Plaintiff understood at that time that eight absences in a rolling twelve month period would result in her discharge from CoxHealth. Plaintiff knew at that time that she was getting close to termination. In November of 2013, Plaintiff received a Corrective Action Memo again for her seventh absence in a rolling twelve month period.[3] Plaintiff testified that she knew she had one absence remaining before discharge and she admitted coming into work sick or with little sleep in order

---

. . .
Q: And if some of those [absences] are protected, they won't count?
A: Correct.
Q: Regardless of whether you had received an FMLA request at that point?
A: If [sic] the event that we should have or could have, then we'll take it out of the count.

See Ex. P, 5-7.

[3] One of the absences previously included in the seven absences as of October 2013 had dropped outside the twelve month rolling period.

to avoid receiving her eighth absence in a rolling twelve month period.  On December 31, 2013, Plaintiff received her eighth absence in a rolling twelve month period.

On January 20, 2014, Plaintiff met with her supervisor, Annie Durrington, Assistant Nurse Manager, who informed Plaintiff that she was being terminated for violating Defendant's attendance policy.  At the meeting, Plaintiff raised an issue of whether her eighth and final absence had been an excused absence, specifically, a "mandatory."  Ms. Durrington stopped the meeting, told Plaintiff to go home, and told Plaintiff she would talk to Thelma Gillette, Nurse Manager, to see whether Plaintiff's final absence was considered an excused absence.  When Plaintiff went home that evening, she spoke to her mother, a manager of human resources for a different company, and Plaintiff's mother asked Plaintiff why she had not applied for FMLA leave related to her migraine headaches.  Plaintiff testified that she did not realize migraine headaches were "something that could be anything for FMLA."

The next day, January 21, 2014, Plaintiff met with her supervisor, Thelma Gillette, Nurse Manager, who informed Plaintiff that her eighth absence was not excused and that Plaintiff was subject to termination.  Plaintiff then inquired about her eligibility for FMLA leave related to migraines.  Plaintiff testified that "I asked her can I at least get FMLA for the time that I had migraines because a lot of my – a lot of the days I missed were due to migraines."  According to Plaintiff, "[Ms. Gillette] said she would have me – she would talk to Cheryl in HR, and she would get back to me and let me know; to pick up some papers for FMLA and have my doctor fill them out, and I would be placed on suspension until then."  Plaintiff obtained FMLA certification paperwork from Defendant and submitted the physician-completed paperwork to Defendant on February 3, 2014.  The FMLA certification paperwork submitted by Plaintiff indicated that Plaintiff suffers from migraines, that she should receive intermittent FMLA leave,

5

and that she saw a physician for migraines on August 1, 2013, September 27, 2013, October 21, 2013, and January 23, 2014.

Following Plaintiff's meeting with Ms. Gillette, Cheryl Dunn with Human Resources spoke to Ms. Gillette, reviewed the absence logs, and contacted Plaintiff to ask what dates in the attendance log Plaintiff was disciplined for that Plaintiff thought should be considered off the record. According to Ms. Dunn, Plaintiff responded, "How the heck do I know?" According to Plaintiff, "[Ms. Dunn] kept asking me what days I thought should be removed, but she wouldn't let me see any of the days that I missed, so I couldn't help her. . . . She just wasn't showing me the days that I missed. She wasn't giving me enough information. I don't know if she just expected me to remember off the top of my head what days I missed . . ." Ms. Dunn admitted that she did not provide Plaintiff any information to go through or look at during their conversation but she stated that Plaintiff should have been aware of the dates of her absences based on her memory and the Corrective Action Memos previously provided to her. Ms. Dunn wrote on February 7, 2014 that "I don't find any evidence that your managers were aware of any chronic condition. You had responsibility prior to the final meeting. We will move forward with termination." Plaintiff's termination was processed and finalized on February 11, 2014 with an effective termination date of January 20, 2014.

Defendant's records reflect that Plaintiff was absent on April 3, 2013 for "ill-headache"; on April 26, 2013 for "ill"; on May 9, 2013 for "son ill"; on July 31, 2013 for "ill"; on August 22, 2013 for "left ill @ 2300"; on September 17, 2013 for "left shift early – sick"; on October 8, 2013 and October 11, 2013 for "gma sick" and "gma in hospital" (counted as one absence); and on December 31, 2013 for "son sick urgent care." This information comes from Defendant's sick log, which was completed by the rotating charge nurse on duty on the date that Plaintiff

6

called in to report her absence. *See* Ex. I.[4] Plaintiff testified that she did not know what was written in the sick log regarding the reason she called in for her absences and Ms. Dunn testified that Plaintiff was never provided access to the logbook showing the reason recorded for Plaintiff's absences. Plaintiff testified that she missed work for migraines on April 3, 2013, April 26, 2013, and July 21, 2013, and that she left early for a migraine on either August 22, 2013 or September 17, 2013. Plaintiff specifically testified that she "called in" for a migraine on April 3, 2013 and that she "probably just called in and said I was having another migraine" on April 26, 2013.

Plaintiff testified that she spoke to several, if not all, of the night shift charge nurses about her migraines and the medications that she was taking for her migraines, including charge nurses Elizabeth S., Chelsea C., Maxine A., Ruth V., Sue W., and Jennifer H. According to Plaintiff, "[e]ach of the RN's rotate schedules for being the nurse in charge for the evening. When you report an absence for the day, you report the absence first to the charge nurse for the floor." Plaintiff testified that she also had multiple discussions with PCA's about her migraines and migraine treatment, including PCA's Cathy M., Melinda F., Paige W., Cody P., Cheryl S., Ebony L., Debbie W., Ashley S., and Cindy. As to Ms. Durrington, the Assistant Nurse Manager, Plaintiff testified:

> I did not talk to [her] very often since [she] worked the day shift. I did tell Annie, in September, about the migraines, about the -- that I had the whole -- the whole blood patch and everything all because of the migraine that started the whole thing. I told her about that. When she would ask me, you know, I would see her in the morning and she would ask how I was doing or something, and I would tell her, oh, like if I had a bad headache that day I would tell her, you know, just in passing.

---

[4] According to Plaintiff, when she reported an absence she "called in to my floor, talked to the charge nurse, and then they transfer you to the nurse's office or the staffing office, and you talk to them as well."

7

Plaintiff admitted, however, that she did not talk to Ms. Durrington about her migraines when Ms. Durrington counseled her for absenteeism on at least three separate occasions. Plaintiff further admitted that she did not tell Ms. Gillette, the Nurse Manager, that she suffered from migraines until their meeting on January 21, 2014.

### B. Application

FMLA regulations state that "[w]hen the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The employee must "comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *Id.* at § 825.303(c). The employee's notice must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* at § 825.303(b). "When an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA"; however, "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." *Id.* Once the employer's obligations are triggered under the Act, the employer "will be expected to obtain any additional required information through informal means" and the employee "has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." *Id.*

The Eighth Circuit interprets this language as placing an "affirmative duty" on the employee to notify his or her employer of the need for leave that might be FMLA-qualifying. *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 785-86, 88 (8th Cir. 2009). While the employee "is not required to understand when she may take FMLA leave, or to state explicitly that she

8

intends to take FMLA leave, or, indeed, even know that the FMLA exists[,]" the employee must "apprise her employer of the specifics of her health condition in a way that makes it reasonably plain that it is serious and tell her employer that this is why she will be absent." *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 474 (8th Cir. 2007). "Her employer would then have the duty to investigate whether she is entitled to FMLA leave." *Id.*; *see also Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) ("Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave."). The Eighth Circuit has reiterated that an employee must to do more than simply call in "sick" in order to trigger the employer's duties under the FMLA; the employee must provide sufficient information to allow the employer to distinguish the specific absence as a type of "unusual and privileged absence" as opposed to an "ordinary sick day" because "[t]o hold otherwise would create an unreasonable burden for employers, requiring them to investigate virtually every absence to ensure that it does not qualify for FMLA leave." *Id.* at 472.

Here, the parties do not dispute that migraine headaches constitute a serious health condition that may entitle an employee to intermittent leave under the FMLA. *See* 29 C.F.R. § 825.113(d) ("headaches *other than migraine* . . . are examples of conditions that do not meet the definition of a serious health condition" (emphasis added)).[5] Nor do the parties dispute that an employee calling in "sick" or with a "headache," alone, is insufficient to provide notice to the employer under the FMLA. *See Ware v. Stahl Specialty Co.*, No. 97-0436-CV-W-6, 1998 WL 184267, at *4-5 (W.D. Mo. Apr. 9, 1998) (unpub.) ("The court agrees with defendant's contention that merely reporting that one will be out sick or with a headache is insufficient notice

---

[5] Indeed, Ms. Dunn from CoxHealth HR testified that "I would say that my knowledge is migraines as a condition qualify for intermittent FML" and "it's one issue that we typically see for intermittent FML that we have hundreds of employees taking intermittent FML for that." *See* Ex. P, at 16.

9

under the FMLA."); *see also Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th Cir. 2005) ("For example, if you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the FMLA requires."). The issue in dispute here is whether Plaintiff's notice was adequate under the totality of the circumstances. "Our cases instruct that the adequacy of an employee's notice requires consideration of the totality of the circumstances, *e.g., Scobey,* 580 F.3d at 787, and is typically a jury question, *Phillips*, 547 F.3d at 909." *Murphy v. FedEx Nat. LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010). The Court finds the answer to that question is better left for the jury in this case. *See, e.g., Murphy*, 618 F.3d 893 (8th Cir. 2010); *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir. 2002); *Ware*, 1998 WL 184267 (W.D. Mo. Apr. 9, 1998).

First, there is a factual dispute as to what Plaintiff actually said when she called into the hospital and spoke to the charge nurses to report her absences. Although the sick log states Plaintiff was absent for "ill" and "headache" on the dates at issue, Plaintiff testified that she missed work and "called in" for migraines on at least two of those dates. Defendant presented no specific testimony from the charge nurses or otherwise to rebut Plaintiff's assertion that she "called in" for migraines, other than citing the sick log itself, arguing linguistic technicalities, and arguing Plaintiff does not remember to whom she spoke on each occasion she called in with a migraine. A reasonable juror could find that a charge nurse, the name of whom Plaintiff reasonably cannot remember, simply wrote "ill" or "headache" rather than the more specific term "migraine headache" on the sick log although Plaintiff actually reported a migraine headache. Holding Plaintiff to the reasons written on the sick log without allowing explanation or elaboration by Plaintiff would surely seem unjust, especially considering Plaintiff was not aware of the reasons written on the sick log, she was not permitted to view the sick log prior to her

10

termination or even while her termination was under review, and she testified she was previously told by Ms. Durrington that she could "call in" to report an absence rather than bring in a notice.

Second, the reasons written on the sick log should not be viewed in a vacuum. Plaintiff's testimony indicates that it was well-known among the night shift employees, including the charge nurses to whom Plaintiff reported her absences,[6] that Plaintiff suffered from migraine headaches and was on migraine medication. Plaintiff's testimony further indicates that Ms. Durrington, Plaintiff's supervisor, had some knowledge of Plaintiff's migraines through Plaintiff's episode in September of 2012 and through occasional comments in passing. Again, Defendant presented no evidence to rebut either of these assertions. Viewing the evidence in the light most favorable to Plaintiff, it is possible that the noted absence for "headache," therefore, may have been sufficient to trigger the employer's obligation to investigate further in light of Defendant's prior knowledge. This is especially true where, as here, Plaintiff later brought her migraines to the attention of the Nurse Manager and HR representative and specifically mentioned the FMLA, where the employer's practice according to an HR representative was to "take out of consideration for termination" absences where an employee "should have or could have" requested FMLA leave even though they failed to do so, and where Plaintiff was told to submit FMLA paperwork and did, which included a doctor's certification that Plaintiff suffers from migraines requiring intermittent leave and that shows Plaintiff attended a doctor's appointment for migraines the day after one of her alleged absences for migraines.

---

[6] The parties did not brief whether a charge nurse could be considered Plaintiff's "employer" or "supervisor" under the circumstances presented here, where the Nurse Manager and Assistant Nurse Manager worked the day shift, where Plaintiff worked the night shift, and where, per protocol, Plaintiff reported her absences to the charge nurse on duty. *See generally* 29 C.F.R. § 2611(4)(A)(ii) (stating the term employer includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer"). While Defendant appears to argue that the RN's were merely Plaintiff's coworkers and their prior knowledge of Plaintiff's migraines is insufficient to trigger any investigative duty on the part of Defendant, the parties did not brief the Court on who Plaintiff reported to during her shift or who was considered Plaintiff's acting supervisor while she was working the night shift.

11

## IV. DECISION

For the reasons stated above, the Court finds a reasonable juror could find Plaintiff provided adequate notice under the FMLA to trigger Defendant's duty to further investigate. Accordingly, a genuine issue of material fact exists for trial and Defendant's Motion for Summary Judgment (Doc. 59) is hereby **DENIED**.[7]

**IT IS SO ORDERED.**
Date:   January 22, 2016                                    /s/ Douglas Harpool
                                                            **DOUGLAS HARPOOL**
                                                            **UNITED STATES DISTRICT JUDGE**

---

[7] Because the Court finds a genuine issue of material fact exists as to whether Plaintiff provided adequate notice that her absences were for migraines, i.e. a serious health condition, the Court need not decide at this time whether a genuine issue of material fact exists as to whether Plaintiff's son's condition was FMLA-protected. Defendant did not move for summary judgment on that basis and it is not necessary to decide in denying Defendant's motion for summary judgment.

12

Case 6:14-cv-03529-MDH   Document 68   Filed 01/22/16   Page 12 of 12